618

Application of Ronald L. ANTONIE.

Patent Appeal No. 76–681.

United States Court of Customs
and Patent Appeals.

Decided Aug. 18, 1977.

Arthur H. Seidel, Thomas W. Ehrmann, Milwaukee, Wis. (Quarles & Brady, Milwaukee, Wis.), attorneys of record, for appellant.

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents, R. D. Edmonds, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, RICH, BALDWIN and MILLER, Judges, and HERBERT N. MALETZ, Judge, United States Customs Court.

BALDWIN, Judge.

This is an appeal from a decision of the Patent and Trademark Office (PTO) Board of Appeals (board) affirming the rejection of claims 1, 2 and 3 of an application for "Rotating Biological Contactor Apparatus"[1] as obvious under 35 U.S.C. § 103 in view of El-Naggar.[2] We reverse.

*The Invention*

Appellant claims a wastewater treatment device in which wastewater is continuously passed through a tank. Semi-immersed contactors (disks) are continuously rotated to aerate their immersed portions and thereby to aerate both microorganisms that grow on the contactors and the wastewater itself. For this discussion, several variables are important in this device. "Throughput" is the volume of wastewater per unit time (gal./day) which the device must treat. "Contactor area" is the total area of the contactors which is exposed to the wastewater as the contactors are rotated (sq. ft.). "Tank volume" is the actual volume of liquid in the tanks in which the contactors

---

1. Serial No. 331,796, filed February 12, 1973.

2. "Method of Treatment of Sewage by Bio-Oxidation and Apparatus Therefor," U.S. Patent No. 3,335,081, issued August 8, 1967.

rotate (gal.). The ratio of throughput to contactor area (gal./day/sq. ft.) is called the "hydraulic loading." Two concepts of effectiveness of the equipment are important in this discussion. The primary prior art reference uses the term "efficiency" to denote the percent impurity reduction which a given set-up of the device achieves and we shall so use the term. Appellant uses the term "maximum treatment capacity" to denote when a *unit of contactor area* is providing maximum "efficiency" *for a given* "throughput" or maximum "throughput" for a given "efficiency." It is essential to understand the distinction between "efficiency," a matter of ultimate effectiveness independent of the efficiency of the equipment, and "treatment capacity," a matter of the efficiency or effectiveness of a unit of contactor area. The latter is more properly associated with the normal use of the term "efficiency" denoting maximum result from a limited resource.

Appellant's claimed device has a ratio of tank volume to contactor area of 0.12 gal./sq. ft.[3] Appellant maintains that this ratio is the most desirable or optimum for all set-ups of the device in the sense that using a lower value gives lower "treatment capacity" and using a greater value gives no increase in "treatment capacity," merely increasing costs. Thus, the value is optimum in that it maximizes "treatment capacity" so that the effectiveness of a given contactor is maximized.

### The Prior Art

El-Naggar teaches the basic structure of the device claimed by appellant but is silent regarding quantitative design parameters other than to give data on a single example, which data was apparently complete *except for any discussion of "tank volume."* El-Naggar stated the "efficiency" (obviously referring to the purity of the output) *could* be increased to 95% by increasing the area of the contactor.

### The Rejection

The examiner rejected the claims as obvious under 35 U.S.C. § 103, noting that the

basic device in question is old as taught by El-Naggar. While the ratio of tank volume to contactor area of 0.12 gal./sq. ft. is not disclosed in El-Naggar, the examiner reasoned that the disclosure of El-Naggar would make a device with that optimum value obvious. The examiner noted that El-Naggar suggests increasing the "efficiency" (degree of purification) of his device by increasing the contactor area while apparently keeping the "throughput" constant, that is, reducing the "hydraulic loading." The examiner then *assumed* that El-Naggar teaches keeping the tank volume constant while increasing the contactor area. Thus, the examiner argued that the idea of increasing tank volume to surface area to increase efficiency is taught and that working out the value for optimum efficiency is mere mechanical experimentation. The board accepted the examiner's reasoning.

### OPINION

In determining whether the invention as a while would have been obvious under 35 U.S.C. § 103, we must first delineate the invention as a whole. In delineating the invention as a whole, we look not only to the subject matter which is literally recited in the claim in question (the ratio value) but also to those properties of the subject matter which are inherent in the subject matter *and* are disclosed in the specification. *In re Davies,* 475 F.2d 667, 177 USPQ 381 (CCPA 1973). In this case, the invention as a whole is the ratio value of 0.12 *and* its inherent and disclosed property. That property is that the described devices designed with the ratio will maximize treatment capacity regardless of the values of the other variables in the devices. Just as *we look to a chemical and its properties* when we examine the obviousness of a composition of matter claim, it is this invention *as a whole,* and not some part of it, which must be obvious under 35 U.S.C. § 103. *Cf. In re Papesch,* 50 CCPA 1084, 315 F.2d 381, 137 USPQ 43 (1963).

---

**3.** Claims 1 and 2 recite "at least about 0.12" while claim 3 recites "about 0.12."

■ The controlling question is simply whether the differences (namely the value of 0.12 and its property) between the prior art and appellant's invention as a whole are such that appellant's invention as a whole would have been obvious. The answer is no. It is impossible to recognize, from the experiment taught by El-Naggar, that "treatment capacity" is a function of "tank volume" or the tank volume-to-contactor area ratio. Recognition of this functionality is essential to the obviousness of conducting experiments to determine the value of the "tank volume" ratio which will maximize treatment capacity. Such functionality can *only be determined* from data representing either efficiency at varying tank volume, fixed throughput, and fixed contactor area or throughput at varying tank volume, fixed efficiency, and fixed contactor area. Each of these experiments represents treatment capacity with fixed contactor area but varying tank volume. This sort of experiment would not be suggested by the teachings of El-Naggar since he was not trying to maximize or control "treatment capacity." The experiments suggested by El-Naggar do not reveal the property which applicant has discovered, and the PTO has provided us with no other basis for the obviousness of the necessary experiments.

■ The PTO and the minority appear to argue that it would always be *obvious* for one of ordinary skill in the art *to try* varying *every* parameter of a system in order to optimize the effectiveness of the system even if there is no evidence in the record that the prior art recognized that particular parameter affected the result.[4] As we have said many times, *obvious to try* is not the standard of 35 U.S.C. § 103. *In re Tomlinson,* 363 F.2d 928, 53 CCPA 1421, 150 USPQ 623 (1966). Disregard for the unobviousness of the results of "obvious to try" experiments disregards the "invention as a whole" concept of § 103, *In re Dien,* 371 F.2d 886, 54 CCPA 1027, 152 USPQ 550 (1967) and *In re Wiggins,* 397 F.2d 356, 55 CCPA 1356, 158 USPQ 199 (1968), and over-emphasis on the routine nature of the data gathering required to arrive at appellant's discovery, after its existence became expected, overlooks the last sentence of § 103. *In re Saether,* 492 F.2d 849, 181 USPQ 36 (CCPA 1974).

In *In re Aller,* 220 F.2d 454, 42 CCPA 824, 105 USPQ 233 (1955), the court set out the rule that the discovery of an optimum value of a variable in a known process is normally obvious. We have found exceptions to this rule in cases where the results of optimizing a variable, which was known to be result effective, were unexpectedly good. *In re Waymouth,* 499 F.2d 1273, 182 USPQ 290 (CCPA 1974); *In re Saether,* supra. This case, in which the parameter optimized was not recognized to be a result-effective variable, is another exception. The decision of the board is *reversed.*

*REVERSED.*

MILLER, J., concurs in the result.

---

4. The precise nature of the El-Naggar experiment and the nature of the data which would result are rendered hopelessly speculative by El-Naggar's total failure to discuss the critical matter of what is done with the volume of the tank. The PTO appears to assume, as a necessary element of its conclusion, that appellant's ratio is the inevitable result of El-Naggar experiment, and that the tank volume is fixed, apparently because El-Naggar does not suggest changing the tank as additional contactor area is supplied. Even if the same tank were used, the actual liquid volume of the tank could change significantly if 1) the tank has a level control, 2) the tank is not extremely large in comparison to the contactors and 3) the volume-to-area ratio of the contactors themselves is significant. Since these assumptions are not unreasonable, there is serious doubt as to the constant volume of the tank.

Whether one would inevitably arrive at the ratio value of 0.12 or above depends on facts which must be read into El-Naggar, (e. g., the volume of the tank) and on assumptions about the kind of motivation (e. g., the degree of "efficiency" which would be sought). All of this involves, at least on this record, mere speculation. Assuming, as the examiner has, that the tank volume is fixed and the natural motivation is to maximize efficiency, if El-Naggar's equipment has a tank volume to contactor area ratio of less than 0.12, and the resulting efficiency is found wanting, increasing the contactor area to increase "efficiency" will lead away from the claimed ratio.

HERBERT N. MALETZ, Judge,* dissenting, with whom RICH, Judge, joins.

With all due respect, I cannot agree with the majority's interpretation of the El-Naggar patent. El-Naggar discloses the same wastewater treatment apparatus as claimed, except for the specific volume-to-surface ratio of .12 gallons per square foot as recited in the claims. However, El-Naggar generally discloses varying the number of disks (column 3, lines 31–35), the number of concentric cylinders (column 4, lines 27–30), or the length of the cylinders (column 4, lines 61–62) in his apparatus in order to optimize results. Given the basic apparatus of El-Naggar and the concept of varying the number of disks *in a tank* in order to optimize impurity removal, I believe that it would have been well within the capabilities of the chemical engineer of ordinary skill to determine empirically, by routine experimentation, the optimum design ratio which appellant has determined and recited in his claims. That is, El-Naggar set the way, and appellant's work was what any routineer would have accomplished in following the patent teachings.

Appellant urges that the results which he determined empirically by plotting the effect of volume-to-surface ratio on impurity removal, including the specific, optimum design ratio of .12 gallons per square foot, could not have been predicted from El-Naggar. However, obviousness under 35 U.S.C. § 103 does not require absolute predictability, *In re Kronig,* 539 F.2d 1300, 190 USPQ 425 (CCPA 1976), and it is sufficient here that El-Naggar clearly led the way for the routineer to arrive at the claimed apparatus.

I am in substantial agreement with the board's analysis of this case, and I would affirm the board's decision.

---

* Judge of the United States Customs Court sitting by designation pursuant to 28 U.S.C. § 293(d).